IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CATHOLIC HEALTHCARE WEST-BAY AREA,<br><br>　　　　　Plaintiff,<br><br>　v.<br><br>SEAFARERS HEALTH & BENEFITS PLAN,<br><br>　　　　　Defendant.<br>_____/ | No. C 06-1741 SI<br><br>**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |

　　　　Defendant Seafarers Health and Benefits Plan has filed a motion for summary judgment, which is currently scheduled for a hearing on January 19, 2007. Pursuant to Civil Local Rule 7-1(b), the Court determines that the matter is appropriate for resolution without oral argument, and VACATES the hearing. For the reasons set forth below, the Court GRANTS the motion.

**BACKGROUND**

**I.　Factual background**

　　　　Plaintiff Catholic Healthcare West – Bay Area ("St. Mary's" or "the Hospital") is a qualified healthcare provider in the business of providing medical services and is licensed by the State of California to operate a hospital. Complaint ¶ 1. The complaint alleges that St. Mary's provided medical treatment for a patient, "W.D.", who was covered under an employer-provided medical insurance plan by defendant Seafarers Health and Benefits Plan ("Seafarers" or "the Plan"). *Id.* ¶ 6. Plaintiff alleges that prior to providing treatment to W.D., St. Mary's contacted Seafarers and verified coverage for W.D., and that "pursuant to said verification of coverage by Seafarers, necessary medical treatment was

administered to patient W.D." *Id.* Defendant has submitted a "call sheet" showing that a St. Mary's employee called the Plan to verify coverage, and that the Plan representative informed the Hospital that W.D. was eligible for "in-patient hospital, 100% of R&C [reasonable and customary] semi-private room rate." *Id.*, Ex. B (call sheet). The call sheet also reflects that the Plan's representative read a disclaimer to the St. Mary's employee. *Id.* According to defendant, that disclaimer states,

> The benefits and eligibility quoted today reflect the information in our system today. It is <u>not</u> a guarantee of benefit payment. All claims are processed in accordance with the plan rules. The plan rules provide specific exclusions and limitations some of which involve the circumstances which may have caused or contributed to the illness or injury. For example, no benefits are payable by the plan if the illness or injury is caused by drug or alcohol abuse or conduct evidencing a reckless disregard for one's health and safety. Determinations regarding the payment of any claim can only be made after the bill and all supporting documents, including pertinent medical records are received and reviewed by the Plan.

*Id.*, Ex. C (emphasis in original).

Plan records indicate that W.D. was admitted to St. Mary's Medical Center on April 16, 2004, and after several months of confinement, W.D. was discharged on July 15, 2004. *See* Benoit Decl. ¶ 4. Two days later on July 17, 2004, W.D. was readmitted to St. Mary's and finally discharged on August 17, 2004. *Id.* At all relevant times, W.D. was a participant of the Seafarers Plan entitled to health benefits in accordance with the Plan's Rules and Regulations. *Id.* ¶ 3. Upon admission to St. Mary's, W.D. assigned his benefits under the Plan to St. Mary's. *Id.* ¶ 4.

St. Mary's submitted a bill for $947,584.35 for W.D.'s first confinement. *Id.* ¶ 7. A Plan processor received ("pended") the claim and made a written request to St. Mary's for W.D.'s hospital records, which were provided on or about September 29, 2004. *Id.* at ¶¶ 7-8. The claim was referred to the Plan's Catastrophic Case Management Consultant, Michael Camp, M.D. *Id.* Dr. Camp performed a "Reasonable and Customary Charges Analysis." Camp Decl. ¶ 5. Dr. Camp concluded that charges in the amount of $570,393 exceeded the Plan's reasonable and customary allowances. *Id.* ¶ 8, & Ex. A. Dr. Kenneth Miller, the Plan's Medical Director, also reviewed St. Mary's bill for "medical necessity." Benoit Decl. ¶ 8. Dr. Miller concluded that the length of W.D.'s stay was excessive and recommended nonpayment for services after June 30, 2004. *Id.* ¶ 9. Based upon the recommendations of Drs. Camp and Miller, the Plan paid $317,268.59 of the bill. *Id.* ¶ 10.

St. Mary's submitted a separate bill for $398,279.22 for W.D.'s second confinement. *Id.* ¶ 11.

The Plan followed the same steps processing the second bill as with the first. Dr. Camp concluded that the bill exceeded the Plan's reasonable and customary charges by $171,337. Camp Decl. ¶ 9 & Ex. B. The Plan determined that the treatment provided to W.D. during the second confinement was medically necessary and that the length of stay was appropriate. Benoit Decl. ¶ 11. The Plan paid $226,942.22 of the second bill. *Id.*

St. Mary's exercised its right of appeal to the Plan's Board of Trustees by submitting two letters dated November 4, 2004 and November 16, 2004. Benoit Decl. ¶ 12, Ex. F, G. In response, the Plan contracted with an independent physician to review the claims. *Id.* ¶ 13. The Plan retained Robin L. Kaplan, M.D. to perform an independent review of both claims. *Id.* According to defendant, Dr. Kaplan was not involved in the original determination, "nor is he a subordinate of any of the Plan professionals." *Id.* ¶ 13.

Dr. Kaplan examined various records, as well as the "Reasonable and Customary Charge Analysis" for both confinements. *Id.* ¶ 14, Ex. H, I (Kaplan's reports). With regard to both confinements, Dr. Kaplan approved of Dr. Camp's analysis of what charges were reasonable and customary. *Id.* However, Dr. Kaplan concluded that W.D.'s in-patient treatment from July 1, 2004 through July 8, 2004 was medically necessary. *Id.*, Ex. H. at 2-3. Pursuant to Dr. Kaplan's recommendation, the Plan made a supplemental payment to St. Mary's in the amount of $49,787.32, leaving a total disputed unpaid balance of $751,865.44. *Id.* ¶ 15.

By letter dated March 3, 2005, St. Mary's filed a second appeal regarding the first confinement. *Id.* ¶ 16, Ex. J. The Trustees denied this appeal by letter dated July 11, 2005. *Id.* ¶ 16, Ex. K.

## II.   Procedural background

Plaintiff filed this action on January 25, 2006, in the Superior Court for the County of San Francisco. The complaint alleged claims for breach of implied contract, negligent misrepresentation, promissory estoppel, quantum meruit, and "indebitatus assumpsis (for work, labor, services, and materials)," and sought the balance of the unpaid bills St. Mary's submitted to the Plan.

On March 7, 2006, defendant removed this case to this Court on the ground that plaintiff's claims were preempted by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C.

§§ 1001 *et seq.* On July 14, 2006, plaintiff filed a motion to remand this case to state court. In an order filed August 16, 2006, the Court denied the motion to remand, holding that plaintiff's claims "relate to" ERISA. The Court held,

> There is no dispute that W.D.'s insurance plan is an employee benefit plan under ERISA. Although plaintiff does not elaborate on what it means by the "simple agreement" between the parties that Seafarers allegedly breached, presumably plaintiff is referring to St. Mary's confirmation of medical coverage for W.D., and Seafarers' "agreement" to pay for expenses under W.D.'s plan. *See* Complaint ¶ 21 ("As a direct and proximate result of Seafarers' . . . assurances and representations that the patient W.D. had health coverage with them, from which payment would be made for all of St. Mary's usual and customary charges for the medical care rendered to patient W.D. as described above, St. Mary's provided medically necessary services, supplies and/or equipment to patient W.D."); *id.* ¶ 18 ("[Defendants] negligently made false representations to St. Mary's without reasonable grounds for doing so that Seafarers . . . would fully pay St. Mary's *usual and customary charges* for rendering medical care to patient W.D. as described above.") (emphasis added). In order to evaluate plaintiff's claims, the fact finder would necessarily be required to interpret W.D.'s policy to determine what expenses were covered.

August 16, 2006 Order at 4. The Court also distinguished *The Meadows v. Employers Health Insurance*, 47 F.3d 1006 (9th Cir. 1995), because in *The Meadows*, the plaintiff health care provider treated a patient who was not covered by an ERISA plan. *See id.* at 4-5 (discussing *The Meadows* and other cases relied on by plaintiff).

## LEGAL STANDARD

Summary adjudication is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

In a motion for summary judgment, "[if] the moving party for summary judgment meets its initial burden of identifying for the court those portions of the materials on file that it believes demonstrate the absence of any genuine issues of material fact, the burden of production then shifts so that the non-moving party must set forth, by affidavit or as otherwise provided in Rule 56, specific facts showing that there is a genuine issue for trial." *See T.W. Elec. Service, Inc., v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S. Ct. 317 (1986). In judging evidence at the summary judgment stage, the Court does not make credibility determinations

or weigh conflicting evidence, and draws all inferences in the light most favorable to the non-moving party. *See T.W. Electric*, 809 F.2d at 630-31 (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S. Ct. 1348 (1986)); *Ting v. United States*, 927 F.2d 1504, 1509 (9th Cir. 1991). The evidence presented by the parties must be admissible. Fed. R. Civ. P. 56(e). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

## DISCUSSION

### I.   Standard of review

The Supreme Court has held that denials of benefits under ERISA are reviewed de novo by the district court "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). "[F]or a plan to alter the standard of review from the default of de novo to the more lenient abuse of discretion, the plan must unambiguously provide discretion to the administrator." *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006) (en banc) (*citing Kearney v. Standard Insurance Co.*, 175 F.3d 1084, 1090 (9th Cir. 1998)).

Here, the Plan is governed by a Board of Trustees in accordance with the Rules of the Plan. *See* DiPrisco Decl. ¶ 9. The Plan's Agreement and Declaration of Trust grants the Trustees "the exclusive and absolute authority and sole discretion to adopt, implement, and interpret Plan Rules." *Id.*, Ex. A at Article V, ¶ 12. "[T]he Trustees are authorized to determine the nature of, and eligibility for benefits, and to adopt Regulations for the provisions of said benefits." *Id.* at Article III, ¶ 1. Moreover, the Plan Rules and Regulations state, "[t]he decision of the Trustees, or a designated Committee of Trustees, shall be final and binding on all parties." *Id.*, Ex. B at Article 2, Section V ¶ 4.

The Ninth Circuit has held that similar wording granting the power to interpret plan terms and to make final benefits determinations confers discretion on the plan administrator. *See, e.g.*, *Abatie*, 458 F.3d at 965 (plan granted administrator "full and final" authority to interpret terms of plan and eligibility for benefits, stated that authority "rests exclusively" with administrator); *Grosz-Salomon v. Paul Revere Life Ins. Co.*, 237 F.3d 1154, 1159 (9th Cir. 2001) (plan provided administrator "has the full, final,

5

conclusive and binding power to construe and interpret the policy under the plan . . . [and] to make claims determinations").

Plaintiff does not address the standard of review in its opposition. Instead, the opposition largely rehashes plaintiff's unsuccessful motion for remand. For the reasons noted *supra* in the Background section and in the Court's August 16, 2006 order, the Court finds plaintiff's contentions lack merit. Accordingly, the Court holds that the abuse of discretion standard applies in this case.[1]

## II. Application of standard of review

The abuse of discretion standard requires reversal of the Plan's determinations if they are arbitrary and capricious. *See Schikore v. BankAmerica Supplemental Retirement Plan*, 269 F.3d 956, 961 (9th Cir. 2001). "A plan administrator's decision to deny benefits must be upheld under the abuse of discretion standard if it is based upon a reasonable interpretation of the plan's terms and if it was made in good faith." *McDaniel v. Chevron Corp.*, 203 F.3d 1099, 1113 (9th Cir. 2000). The question is not "whose interpretation of the plan documents is most persuasive, but whether the . . . interpretation is unreasonable." *Canseco v. Construction Laborers Pension Trust*, 93 F.3d 600, 606 (9th Cir. 1996) (citations and internal quotations omitted).

### A. "Reasonable and customary charge"

The Plan defines "reasonable and customary charge" as follows:

---

[1] In *Abatie*, the Ninth Circuit also stated, "[w]e read *Firestone* to require abuse of discretion review whenever an ERISA plan grants discretion to the plan administrator, but a review informed by the nature, extent, and effect on the decision-making process of any conflict of interest that may appear in the record. This standard applies to the kind of inherent conflict that exists when a plan administrator both administers the plan and funds it, as well as to other forms of conflict." *Abatie*, 458 F.3d at 967. However, in *Pinto v. Reliance Standard Life Insurance Company*, 214 F.3d 377 (3d Cir. 2000), the court explained that there is no conflict where the employer establishes a plan, pays fixed contributions, and creates a benefits committee with authority to interpret the plan's terms and administer benefits. *Id.* at 383.
Here, the Plan is a "multi-employer labor-management trust fund which is funded solely through employer contributions." DiPrisco Decl. ¶ 2. The rate of contribution is based upon the recommendation of Plan actuaries and is negotiated between signatory employers and the union. *Id.* The Plan is a non-profit entity and all of its assets are held in trust and used for the payment of benefits and related administrative costs. *Id.* Thus, there is no conflict of interest, and the Court applies a "straightforward abuse of discretion analysis." *Abatie*, 458 F.3d at 968.

6

> The rate recommended by professionals who have researched medical costs throughout the United States, or the actual cost of a medical service or supply, whichever is lower. Such recommendations are based upon the relative value of a particular health care service as compared to other procedures, and the cost of equivalent services in the geographic region where the service was provided.

DiPrisco Decl. Ex. B, Definitions ¶ 17. Defendant has submitted the declaration of Dr. Camp in which he explains the methodology he used to determine the "reasonable and customary" charges. Dr. Camp states,

> The following methodology is utilized for all claims that I review for the Plan. I used the Igenix Medical Data Research Reasonable and Customary Charge Database (otherwise known as MediCode) to determine the reasonable and customary charges for medical services and procedures as categorized by the Current Procedural Terminology ("CPT") Code. CPT Code is an American Medical Association uniform designated descriptor of medical services, supplies and materials. MediCode is a region-specific reasonable and customary charge database organized by zip-code. During 2004, the Plan allowed payment at the 90th percentile of what MediCode specifies as "reasonable and customary."
>
> For pharmaceuticals and supplies, I used the 2004 edition of the Red Book, published by Thomson Healthcare to determine the Average Wholesale Price (AWP). For medical supplies not included in the Red Book, I allowed a minimum of twice the wholesale cost or price of the supplies, as determined by the manufacturer's invoice or price quotes from providers of such supplies.

Camp Decl. ¶¶ 6-7. Dr. Kaplan's reports regarding the appeals of the two bills state that "[t]he methodology [Dr. Camp] employed is widely accepted and is standard for this type of analysis," Benoit Decl. Ex. G at 2-3 (first confinement), and "[Dr. Camp's] methodology was sound and was not categorically refuted by Mr. Williams in his letter of appeal." *Id.*, Ex. H at 1-2 (second confinement).

Plaintiff asserts that there is a dispute of fact regarding what is "reasonable and customary," and has submitted the declaration of H.E. Frech, III, Ph.D. Dr. Frech criticizes Dr. Camp's methodology, stating *inter alia*, that Dr. Camp "does not state whether his determination of 'reasonable and customary' was made under some traditional definition of terms within the hospital reimbursement marketplace or some other marketplace"; that Dr. Camp "provides no indication that he accounted for any of St. Mary's Medical Center's unique scope of services and cost structure when determining a 'reasonable' reimbursement for the claims at issue"; and that "Seafarer's methodology . . . does not follow any traditional definitions that are used within the hospital reimbursement industry." Frech Decl. ¶¶ 4, 6, 7. Defendant responds that Dr. Frech's critique is irrelevant because the law does not require the Plan to adopt plaintiff's preferred definition of "reasonable and customary," but only that the Plan's

7

interpretation of "reasonable and customary" is reasonable and in good faith.

The Court agrees with defendant that the question is not "whose interpretation of the plan documents is most persuasive, but whether the . . . interpretation is unreasonable." *Canseco*, 93 F.3d at 606. The Court concludes that Plan's determination should be upheld because the Plan decided upon a "rate recommended by a professional" – Dr. Camp – who "researched medical costs throughout the United States" through his usage of MediCode and the Red Book, and who made a recommendation "based upon the relative value of a particular health care service as compared to other procedures, and the cost of equivalent services in the geographic region where the service was provided." Plaintiff has not shown that the Plan's reliance on this methodology was unreasonable or in bad faith. *See McDaniel*, 203 F.3d at 1113-14.

**B.     "Medically necessary"**

The Plan states, in relevant part:

> The Plan will not pay benefits for treatments or procedures that it determines are not medically necessary. This exclusion includes, but is not limited to . . . treatment that exceeds the level or length of care, treatment or supply that exceeds that which are needed to provide safe and adequate care and treatment.

DiPrisco Decl. Ex. B, Other Limitations ¶ B. Through the initial review of Dr. Miller, and the appellate review of Dr. Kaplan, the Plan determined that a portion of W.D.'s initial confinement was not medically necessary. The record before the Court does not contain Dr. Miller's report. However, defendant has submitted a copy of Dr. Kaplan's report, which states, in relevant part:

> The clinical progress notes from 7/1/04 through 7/8/04 [a period originally deemed not medically necessary by Dr. Miller] document ongoing clinical problems that, in my professional opinion, support the medical necessity and appropriateness of continued acute inpatient services on those dates [discussing specific clinical progress notes].
> The progress notes and physicians orders dating from 7/9/04 to 7/15/04 document overall stability and slow but steady improvement in [W.D.'s] clinical status, with discontinuation of antibacterial antibiotic therapy, increased in activity level and hemodynamic and hemotologic stability. In contrast to the period between 7/1/04 and 7/8/04, when the platelet level dipped as low as 2000 and uncertainty prevailed as to the status of the sinus infection, from 7/9/04 onward the platelet count remained above 11,000 and there was clear evidence that the sinus infection was responding to antifungal treatment.
>
> . . . . Given the patient's stormy inpatient course prior to [7/8/04], it seems entirely appropriate to have proceeded as deliberately as his attending physicians had to that point. In contrast, however, once the decision to cancel surgery was made, the need to

8

> continue treatment in hospital was no longer apparent, or adequately documented. Therefore, in my professional opinion, acute inpatient services were not appropriate or medically necessary from 7/9/04 onward.

Benoit Decl. Ex. H at 2-3.

The Court concludes that Plan did not act in an arbitrary and capricious manner when it determined that W.D.'s treatment from July 9, 2004 through July 15, 2004 was not medically necessary. As an initial matter, the Court notes that plaintiff does not even address this issue in its opposition. Regardless, the Court finds that Dr. Kaplan's report shows that he reviewed relevant documents in connection with his assessment of W.D.'s first confinement, and he provided a detailed explanation based upon those records of why the acute inpatient services between July 9, 2004 and July 15, 2004 were not medically necessary. The Plan's decision to deny coverage for this time period must be upheld because it was "based upon a reasonable interpretation of the plan's terms" and "was made in good faith." *McDaniel*, 203 F.3d at 1113.

## III.     Evidentiary objections

Plaintiff objects that defendant's evidence regarding the Plan is irrelevant because plaintiff is not asserting any claims under ERISA. For the reasons stated *supra*, the Court rejects that contention. Moreover, much of this evidence is already part of the record in connection with plaintiff's motion for remand, and plaintiff did not object at that time. Plaintiff also objects to defendant's declarations under Federal Rule of Evidence 403. The Court finds these objections lack merit, as none of the statements at issue are confusing, misleading or prejudicial. Finally, the Court rejects plaintiff's hearsay objections to the Benoit declaration, and finds that Dr. Camp may testify as a percipient witness.

///

**CONCLUSION**

For the foregoing reasons and good cause shown, the Court GRANTS defendant's motion for summary judgment. (Docket No. 35). The Court DENIES plaintiff's request for judicial notice of unpublished cases. (Docket No. 47). The Court OVERRULES plaintiff's evidentiary objections. (Docket Nos. 51, 52, and 53).

**IT IS SO ORDERED.**

Dated: January 18, 2007

SUSAN ILLSTON
United States District Judge

10